IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| VALERIE COSGROVE, Derivatively on Behalf of CARBONITE, INC.,<br><br>     Plaintiff,<br><br>v.<br><br>MOHAMAD S. ALI, ANTHONY FOLGER, STEPHEN MUNFORD, LINDA CONNLY, SCOTT A. DANIELS, DAVID FRIEND, CHARLES F. KANE, TODD KRASNOW, MARINA LEVINSON,<br><br>     Defendants,<br><br>and<br><br>CARBONITE, INC., a Delaware Corporation,<br><br>     Nominal Defendant. | Civil Action No.<br><br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS, BREACH OF FIDUCIARY DUTY, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT**<br><br><br><br>JURY DEMAND |

Plaintiff Valerie Cosgrove ("Plaintiff"), by her attorneys, submits this Verified Shareholder Derivative Complaint for Violations of Federal Securities Laws, Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment, derivatively for the benefit of Nominal Defendant Carbonite, Inc. ("Carbonite" or the "Company"). Plaintiff bases her allegations on personal knowledge and, as to all other matters outside her personal knowledge, upon information and belief based on the investigation of counsel, which includes without limitation: (i) review and analysis of public filings with the United States Securities and Exchange Commission ("SEC"); (ii) review and analysis of filings in federal court, including pleadings in the related securities fraud class actions, *Luna v. Carbonite, Inc.*, C.A. 1:19-cv-11662-LTS (D. Mass.) filed August 1, 2019 and *Feng v. Carbonite, Inc.*, C.A. 1:19-cv-11808-LTS (D. Mass.) filed August 23, 2019 (the

"Securities Class Actions"); and (iii) review and analysis of press releases, news reports, analyst reports, industry reports, investor conference call transcripts, and other information available in the public domain.

## I.    INTRODUCTION

1.     This is a shareholder derivative action brought on behalf of and for the benefit of Carbonite that seeks to redress wrongdoing by the Company's board of directors (the "Board") and certain of its senior officers.  From at least February 7, 2019 and continuing through the present (the "Relevant Time Period"), the Individual Defendants (defined below) breached their fiduciary duties owed to Carbonite and its shareholders and committed other violations of federal and state law by, *inter alia*, causing or allowing the Company to issue materially false and misleading statements and/or omit material information from its public filings and communications, the disclosure of which would have made such filings and communications not misleading.  By and through the Individual Defendants' violations of law, Carbonite has sustained and will continue to sustain damages, including hundreds of millions of dollars in losses to the Company's market capitalization, as well as significant harm to its reputation, goodwill, and standing in the business community.  Moreover, the Individual Defendants' wrongdoing has exposed the Company to millions of dollars in potential liability from the Securities Class Actions, and the significant costs incurred and to be incurred in connection with the litigation and potential resolution of that action.

2.     Founded in 2005, Boston-based Carbonite provides a robust data protection platform for businesses, including backup, disaster recovery, high availability, and workload migration technology.  The Carbonite data protection platform supports businesses on a global scale with secure cloud infrastructure.

3.     On October 18, 2018, Carbonite announced the launch of its Server Backup VM Edition for Managed Service Providers (MSPs).  MSPs are entities that remotely manage a

customer's IT infrastructure and/or end-user systems. A "VM" or virtual machine is a software program or operating system capable of performing tasks such as running applications and programs as if it were a separate computer. A VM, usually known as a "guest," is created within another computing environment referred to as a "host." Multiple VMs can exist within a single host at one time. Carbonite's Server Backup VM edition was designed to allow MSPs to protect virtualized environments both locally and in their own cloud.

4.     In introducing the Server Backup VM Edition, Carbonite hoped to compete against companies such as Veeam, which pioneered the market for VM data protection.

5.     In conjunction with the launch of the Server Backup VM Edition, Carbonite also introduced its "refreshed" and expanded Data Protection Console which would be a "purpose-built backup for virtual machines (VMs) and enable[] businesses to select, manage and recover their VM data from a single location, the Carbonite Data Protection Console." The combination of the Server Backup VM Edition and the refreshed Data Protection Console would permit Carbonite to offer its customers "a fully integrated service that protects virtualized environments both locally and in their own cloud."

6.     On November 1, 2018, defendant Mohamad S. Ali, Carbonite's President and Chief Executive Officer (CEO), announced that the launch of the Carbonite Server VM Edition along with the refreshed Data Protection Console would be integral to the execution of Carbonite's "strategic plan" to "address all of the market's most pressing data protection needs." He further trumpeted it as "one of the single biggest development efforts in the company's history" and an "important milestone" in transforming the Company into the leader in business data protection. Significantly, the Carbonite Server Backup VM Edition would be a key driver in the growth of Carbonite's financial performance for 2019 and 2020.

7.      Beginning in early 2019, the Individual Defendants made positive public statements about the Carbonite Server Backup VM Edition and its effect on the Company's future revenues and growth.  For example, on February 7, 2019, the Company announced encouraging financial guidance for fiscal 2019, which included revenues from the roll out of the Carbonite Server Backup VM Edition.  Carbonite's "Business Outlook" included Non-GAAP Revenue of $488 to $502 million for the year, and Adjusted EBITDA of $129 million to $134 million.

8.      Defendant Ali also commented on Carbonite's financial results, stating, in relevant part:

> We delivered on our strategic priorities in 2018 . . . .  We significantly strengthened our product platform and introduced one of the most complete Software-as-a-Service data protection portfolios in the market; we did this while successfully continuing our acquisition integration work and driving meaningful improvements in profitability.  In 2019 we plan to build upon these efforts, further expanding our data protection platform and delivering a broader set of solutions to our customers, while we invest aggressively in our distribution channels with a focus on driving continued growth and profitability.

9.      On May 2, 2019, Carbonite released its first quarter 2019 financial results and increased its projections for 2019 Non-GAAP Revenue to a range of $491 million to $505 million, a material increase from its prior guidance of $488 million to $502 million.

10.      Later that day, defendant Ali publicly stated:

> This new product that we have out there, I mean has these excellent features up and down, right, and sort of has everything that you need.  And this product, it does core backup, it does ransomware protection.  It does legal hold.  If you lose the device, you can locate it on a map.  If you lose the device, you can remotely wipe it.  So it's really a full-feature product, and it can scale to a business of up to 2 million customers.  So it's extremely, extremely scalable.  It's globally deployable. So if you're a business with operations in 50 countries, it can be deployed.

11.      At the same time the Individual Defendants were touting Carbonite's business and its Server Backup VM Edition, certain defendants were dumping their personal Carbonite stock holdings.  Between February 14, 2019 and July 1, 2019, defendant Ali and Carbonite Chief

Financial Officer (CFO), Anthony Folger, sold 63,176 shares of Carbonite common stock and realized more than $1.5 million in proceeds from these sales.

12.     The Individual Defendants' positive statements, however, were materially false and misleading when made because they misrepresented and failed to disclose the following adverse facts (the "Undisclosed Facts"), which were known to these defendants or recklessly disregarded by them: (i) that Carbonite's Server Backup VM Edition was of poor quality and technologically flawed; (ii) that Carbonite was receiving poor reviews and complaints from customers about the Server Backup VM Edition; (iii) that the poor quality and technological flaws of the Server Backup VM Edition was acting as a "disruptive" factor throughout the Carbonite salesforce and keeping that sales organization from closing opportunistically on several larger deals during fiscal 2019; and (iv) as a result, Carbonite's financial guidance lacked a reasonable basis when made and the Company's other public statements were materially false and misleading at all relevant times.

13.     On July 25, 2019, Carbonite announced that it was withdrawing its Server Backup VM Edition product from the marketplace and consequently dramatically lowered its financial guidance for fiscal 2019 and 2020.  In doing so, defendant Folger admitted that: "we determined that the virtual server edition of our server backup product was not at the level of quality that customers have come to expect from Carbonite. . . .  While we assessed the best path forward, we have removed any growth expectations associated with virtual server edition from our short-term outlook."

14.     That same day, the strongest proponent of the Company's Server Backup VM Edition, defendant Ali, announced he was leaving Carbonite.

15.     On this news, Carbonite stock fell $5.89 per share, or about 25%, to close at $18.01 per share on July 26, 2019, wiping out more than $200 million in market capitalization.

16.     Three more of Carbonite's six Executive Officers, as identified by the Company in its SEC filings, quickly followed Ali out the door.  Carbonite's Senior Vice President (SVP) of Sales stepped down on August 14, 2019; its General Counsel and Corporate Secretary agreed to resign the next day; and the SVP of Marketing resigned on August 26, 2019.

17.     As a direct result of this unlawful course of conduct, Carbonite is now the subject of the Securities Class Actions.  The Securities Class Actions assert claims under sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") against Carbonite, Ali, and Folger in connection with these improper public statements which artificially inflated the price of Carbonite's securities.

18.     The Board has not, and will not, commence litigation against the Individual Defendants named in this Complaint, let alone vigorously prosecute such claims, because they face a substantial likelihood of liability to Carbonite for authorizing or failing to correct the false and misleading statements alleged herein, and for failing to correct and/or implement the necessary policies, procedures, and internal controls to prevent the harm to the Company that has occurred. Accordingly, a pre-suit demand upon the Board is a useless and futile act.  Thus, Plaintiff rightfully brings this action to vindicate the Company's rights against its wayward fiduciaries and hold them responsible for the damages they have caused to Carbonite and its shareholders.

## II.     JURISDICTION AND VENUE

19.     Pursuant to 28 U.S.C. § 1331 and section 27 of the Exchange Act (15 U.S.C. § 78aa), this Court has jurisdiction over the claims asserted herein for violations of section 14(a) of the Exchange Act and the claims for breach fiduciary duty premised upon duties imposed and defined by federal substantive corporation law.  This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. § 1367.

6

20.    This Court has personal jurisdiction over each defendant because each defendant is either a corporation conducting business and maintaining operations in this District or is an individual who is either present in this District for jurisdictional purposes or has, directly and indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities exchanges and markets, such that each defendant has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

21.    Venue is proper in this jurisdiction pursuant to 28 U.S.C. § 1391(b) because (i) Carbonite maintains its principal place of business in this District; (ii) one or more of the defendants resides or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein occurred in this District; and (iv) the Individual Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities in this District.

## III.    PARTIES

### A.    Plaintiff

22.    Plaintiff Valerie Cosgrove is a current shareholder of Carbonite and has continuously owned shares since November 2, 2018.

23.    Plaintiff will hold Carbonite shares continuously throughout the pendency of this action.  Plaintiff brings this action derivatively in the right of and for the benefit of Carbonite. Plaintiff will fairly and adequately represent the interests of Carbonite and its shareholders in enforcing the rights of the Company.

B.    **Nominal Defendant**

24.    Nominal Defendant Carbonite provides backup, disaster recovery, high availability, and workload migration technology solutions in the United States and globally.  The Company provides its solutions through distributors, value-added resellers, managed service providers, and global systems integrators.  Carbonite was founded in 2005 and is headquartered in Boston, Massachusetts.  The Company's shares trade on the NASDAQ under the ticker symbol "CARB."

C.    **Individual Defendants**

25.    Defendant Mohamad S. Ali served as Carbonite's President and CEO between December 2014 and July 2019, and a member of the Board between January 2015 and July 2019. Ali is named as a defendant in the related Securities Class Actions that allege he violated sections 10(b) and 20(a) of the Exchange Act.  Defendant Ali breached his fiduciary duties to the Company and its shareholders as described below.  Defendant Ali also knowingly, recklessly, or with gross negligence made (or allowed to be made) improper statements in Carbonite's press releases, public filings, and other public statements relating to the Company's Server Backup VM Edition and the Company's current operations and future outlook.  Defendant Ali also negligently violated section 14(a) of the Exchange Act by making misleading statements in the Company's 2019 Proxy. In 2017 and 2018, Carbonite paid Ali as follows:

| YEAR | SALARY | STOCK AWARDS | NONEQUITY INCENTIVE PLAN COMPENSATION | OTHER COMPENSATION | TOTAL COMPENSATION |
|------|--------|-------------|---------------------------------------|--------------------|--------------------|
| 2017 | $415,933 | $2,283,906 | $229,506 | $11,610 | $2,940,954 |
| 2018 | $433,250 | $3,055,672 | $422,736 | $11,810 | $3,923,468 |

Additionally, while the price of Carbonite stock was artificially inflated and defendant Ali was in possession of material, adverse nonpublic information, he sold 45,509 shares of personally held Carbonite stock at artificially inflated prices for proceeds of more than $1.1 million.

26.     Defendant Anthony Folger has been Carbonite's CFO and Treasurer since January 2013.  Among other things, Folger oversees Carbonite's customer facing and business operations including customer support, data center operations, finance, investor relations, corporate development, information technology, business analytics, and human resources.  Folger is named as a defendant in the related Securities Class Actions that allege he violated sections 10(b) and 20(a) of the Exchange Act.  Defendant Folger breached his fiduciary duties to the Company and its shareholders as described below.  Defendant Folger also knowingly, recklessly, or with gross negligence made (or allowed to be made) improper statements in Carbonite's press releases, public filings, and other public statements relating to the Company's Server Backup VM Edition and the Company's current operations and future outlook.  In 2017 and 2018, Carbonite paid Folger as follows:

| YEAR | SALARY | STOCK AWARDS | NONEQUITY INCENTIVE PLAN COMPENSATION | OTHER COMPENSATION | TOTAL COMPENSATION |
|------|--------|--------------|---------------------------------------|--------------------|--------------------|
| 2017 | $369,235 | $986,646 | $132,144 | $11,610 | $1,499,625 |
| 2018 | $380,312 | $1,527,810 | $185,542 | $11,810 | $2,105,474 |

Additionally, while the price of Carbonite stock was artificially inflated and defendant Folger was in possession of material, adverse nonpublic information, he sold 17,667 shares of personally held Carbonite stock at artificially inflated prices for proceeds of more than $432,000.

27.     Defendant Stephen Munford was appointed Interim CEO and President on July 25, 2019.  Munford has also served as a director since January 2014, has been Chairman of the Board since March 2016, and was a member Nominating and Governance Committee ("Governance Committee") between 2015 and July 2019.  Defendant Munford breached his fiduciary duties to the Company and its shareholders as described below.  Defendant Munford also knowingly, recklessly, or with gross negligence made (or allowed to be made) improper statements in Carbonite's press releases, public filings, and other public statements relating to the Company's

Server Backup VM Edition and the Company's current operations and future outlook. Defendant Munford also negligently violated section 14(a) of the Exchange Act by making misleading statements in the Company's 2019 Proxy. In 2017 and 2018, Carbonite paid Munford $196,578 and $209,474, respectively, the majority of which consisted of Carbonite stock awards. As Interim CEO and President, in 2019 Munford is being paid a Base Salary of $448,761, an incentive bonus of up to 130% of his Base Salary, $2,500,000 in Restricted Stock Units, and additional employee benefits.

28.     Defendant Linda Connly has served as a director since February 6, 2019 and is a member of the Compensation Committee. Defendant Connly breached her fiduciary duties to the Company and its shareholders as described below. Defendant Connly also knowingly, recklessly, or with gross negligence made (or allowed to be made) improper statements in Carbonite's press releases, public filings, and other public statements relating to the Company's Server Backup VM Edition and the Company's current operations and future outlook. Defendant Connly also negligently violated section 14(a) of the Exchange Act by making misleading statements in the Company's 2019 Proxy. In 2019, Carbonite will pay Connly $42,000 in director fees plus an initial grant of $200,000 in restricted shares which vest over three years and are settled in shares of Carbonite common stock.

29.     Defendant Scott A. Daniels has served as a director since January 2016. Daniels has been a member of the Board's Audit Committee since 2016. Defendant Daniels breached his fiduciary duties to the Company and its shareholders as described below. Defendant Daniels also knowingly, recklessly, or with gross negligence made (or allowed to be made) improper statements in Carbonite's press releases, public filings, and other public statements relating to the Company's Server Backup VM Edition and the Company's current operations and future outlook. Defendant

Daniels also negligently violated section 14(a) of the Exchange Act by making misleading statements in the Company's 2019 Proxy. In 2017 and 2018, Carbonite paid Daniels $179,078 and $191,974, respectively, the majority of which consisted of Carbonite stock awards.

30.    Defendant David Friend has served as a director since February 2005. He is a Co-Founder of the Company and served as CEO from February 2005 to December 2014, as President from February 2005 to September 2007, and again from August 2010 to December 2014. On December 3, 2014, Friend resigned as President and CEO and became Executive Chairman of the Board, where he served from December 2014 to February 2016. Defendant Friend breached his fiduciary duties to the Company and its shareholders as described below. Defendant Friend also knowingly, recklessly, or with gross negligence made (or allowed to be made) improper statements in Carbonite's press releases, public filings, and other public statements relating to the Company's Server Backup VM Edition and the Company's current operations and future outlook. Defendant Friend also negligently violated section 14(a) of the Exchange Act by making misleading statements in the Company's 2019 Proxy. In 2017 and 2018, Carbonite paid Friend $165,578 and $178,474, respectively, the majority of which consisted of Carbonite stock awards. Defendant Friend beneficially owns 742,876 shares of Carbonite common stock (2.2% of outstanding shares) as of March 22, 2019, with a value exceeding $10 million.

31.    Defendant Charles F. Kane has served as a director since July 2011. Kane has been a member of the Board's Governance Committee since 2013 and Chair of the Audit Committee since at least 2011. Defendant Kane breached his fiduciary duties to the Company and its shareholders as described below. Defendant Kane also knowingly, recklessly, or with gross negligence made (or allowed to be made) improper statements in Carbonite's press releases, public filings, and other public statements relating to the Company's Server Backup VM Edition and the

Company's current operations and future outlook.  Defendant Kane also negligently violated section 14(a) of the Exchange Act by making misleading statements in the Company's 2019 Proxy.  In 2017 and 2018, Carbonite paid Kane $183,578 and $196,474, respectively, the majority of which consisted of Carbonite stock awards.

32.     Defendant Todd Krasnow has served as a director since September 2005 and has been a member of the Board's Audit Committee since at least 2011.  Defendant Krasnow breached his fiduciary duties to the Company and its shareholders as described below.  Defendant Krasnow also knowingly, recklessly, or with gross negligence made (or allowed to be made) improper statements in Carbonite's press releases, public filings, and other public statements relating to the Company's Server Backup VM Edition and the Company's current operations and future outlook.  Defendant Krasnow also negligently violated section 14(a) of the Exchange Act by making misleading statements in the Company's 2019 Proxy.  In 2017 and 2018, Carbonite paid Krasnow $183,078 and $195,974, respectively, the majority of which consisted of Carbonite stock awards.

33.     Defendant Marina Levinson has served as a director since May 2017 and the Chair of the Governance Committee since July 2019.  Defendant Levinson breached her fiduciary duties to the Company and its shareholders as described below.  Defendant Levinson also knowingly, recklessly, or with gross negligence made (or allowed to be made) improper statements in Carbonite's press releases, public filings, and other public statements relating to the Company's Server Backup VM Edition and the Company's current operations and future outlook.  Defendant Levinson also negligently violated section 14(a) of the Exchange Act by making misleading statements in the Company's 2019 Proxy.  In 2017 and 2018, Carbonite paid Levinson $312,795 and $181,474, respectively, the majority of which consisted of Carbonite stock awards.

34.     Defendants Ali, Munford, Connly, Daniels, Friend, Kane, Krasnow, and Levinson are collectively referred to as the "Director Defendants." The Director Defendants and Folger are sometimes collectively referred to as the "Individual Defendants." Krasnow, Daniels, and Kane are collectively referred to as the "Audit Committee Defendants." Defendants Kane and Munford are collectively referred to as the "Governance Committee Defendants." Ali and Folger are collectively referred to as the "Securities Class Action Defendants" or the "Insider Selling Defendants."

## IV.   DEFENDANTS' DUTIES

### A.     The Individual Defendants' Fiduciary Duties

35.     By reason of their positions as officers and/or directors of Carbonite and because of their responsibility to control the business and corporate affairs of the Company, the Individual Defendants owed, and owe, the Company and its shareholders the fiduciary obligations of good faith, loyalty, due care, and candor and were, and are, required to use their utmost ability to control and manage the Company in a just, honest, fair, and equitable manner. Each Individual Defendant owed, and owes, the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company, as well as the highest obligations of fair dealing and not to act in furtherance of their personal interest or benefit.

36.     Because of their positions of control and authority as officers and/or directors of Carbonite, the Individual Defendants were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their advisory, executive, managerial, and directorial positions with Carbonite, each of the Individual Defendants had knowledge of material, nonpublic information regarding the Company. In addition, as officers and/or directors of a publicly-held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's business, operations,

and prospects so that the market price of the Company's stock would be based on truthful and accurate information.

37.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Carbonite and was acting within the course and scope of such agency.

38.     To discharge their duties, the Individual Defendants were, and are, required to exercise reasonable and prudent oversight and supervision over the management, policies, practices, and controls of Carbonite.  By virtue of such duties, the Individual Defendants were, and are, required to, among other things:

> a.    exercise good faith to ensure that the Company is operated in a diligent, efficient, honest, and prudent manner and in accordance with all applicable laws (including federal and state laws, government rules and regulations, and the Company's Certificate of Incorporation and Bylaws);
>
> b.    neither violate nor knowingly permit any officer, director, or employee of Carbonite to violate any applicable laws, rules, or regulations;
>
> c.    remain informed as to the status of Carbonite's operations, and upon receipt or notice of information of imprudent or unsound practices, to make a reasonable inquiry in connection thereto and to take steps to correct such conditions or practices;
>
> d.    establish and maintain systematic and accurate records and reports of the business and affairs of Carbonite and procedures for the reporting of the Company's business and affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;
>
> e.    maintain and implement an adequate, functioning system of internal controls, such that the affairs and operations of Carbonite are conducted in accordance with all applicable laws, rules, and regulations; and
>
> f.    truthfully and accurately inform and guide investors and analysts with respect to the business operations of the Company.

### B.      Duties Pursuant to the Company's Corporate Governance Guidelines

39.      The Company's Corporate Governance Guidelines (adopted October 2016) ("Governance Guidelines") were adopted by the Board "to embody in a single document the principles by which the Board operates."   According to the Governance Guidelines, the "Board Responsibilities" are as follows:

> The Board is the ultimate decision-making authority within the Company, except with respect to those matters, including the election of directors that are reserved for the Company's shareholders.   In order to maximize long-term shareholder value, the Board's primary functions are to:
>
> - Oversee the management of the Company.
>
> - Establishing an environment that promotes timely and effective disclosure and that the Company's business is conducted with the highest standards of ethical conduct and in conformity with applicable laws and regulations.
>
> - Review and approve the Company's strategic, financial, and other corporate plans.
>
> - Oversee strategic and financial risks and exposures associated with the Company's business strategy, policy matters and regulatory environment.
>
> - Evaluate the integrity of the Company's accounting and financial and reporting systems and internal controls.
>
> - Manage conflicts of interests in accordance with applicable laws and listing standards.
>
> - Select the Non-Executive Chairman of the Board and the Chief Executive Officer and review management succession planning.
>
> The business of the Company is conducted by management under the oversight of the Board. The roles of the Board and management are related, but distinct. The Company's business strategy is developed and implemented under the leadership and direction of the Chief Executive Officer.  The members of the Board are elected by the shareholders to oversee management's performance on behalf of the shareholders and act as advisors and counselors to the Chief Executive Officer and management.  In performing its general oversight function, the Board reviews and assesses the Company's strategic and business planning as well as management's approach to addressing significant risks and challenges facing the Company.  As part of this function, the Board reviews and discusses reports regularly submitted to the Board by management with respect to the Company's performance, as well

as significant events, issues and risks that may affect the Company's business or financial performance. In performing its oversight function, the Board and its members will maintain frequent, active and open communication and discussions with the Chief Executive Officer and the Company's management.

**C.      Duties Pursuant to the Company's Code of Business Conduct and Ethics**

40.      The Individual Defendants were also bound by the Company's Code of Business Conduct and Ethics (adopted July 2011) (the "Code of Conduct"), which applies to all officers, employees and directors of Carbonite and its subsidiaries.

41.      According to the Code of Conduct: "The Nominating and Corporate Governance Committee of the Board of Directors is responsible for coordinating the Board's oversight of this Code and compliance herewith." Additionally, "All Employees [which includes officers] and directors of the Company are expected to read the policies set forth in this Code and ensure that they understand and comply with all such policies."

42.      The stated purpose of the Code of Conduct is as follows:

This code intends to ensure fair and accurate financial reporting, to promote ethical conduct in compliance with applicable laws, rules and regulations, to provide guidance with respect to the handling of ethical quandaries, to encourage a culture of openness and accountability and to deter wrongdoing.

43.      The Code of Conduct further stated, in relevant part:

**Disclosure:** In order to for the Company to effectively comply with the laws, rules and regulations to which it is subject, all Employees and directors of the Company are responsible for the accurate and complete reporting of financial information within their respective areas of responsibility and for the timely notification of senior management of financial and nonfinancial information that may be material to the Company.

Each Employee and director, to the extent involved in the Company's disclosure process, including without limitation the Principal Officers, the Company's General Counsel and other senior management of the Company, shall familiarize himself or herself with the disclosure requirements applicable to the Company as well as the business and financial operations of the Company and shall not knowingly misrepresent, or cause others to misrepresent, facts about the Company to others, whether within or outside the Company, including to the Company's independent auditor, government regulators and self-regulatory organizations.

**Compliance with Laws:** Employees and directors of the Company shall respect and obey all applicable laws, rules and regulations when carrying out responsibilities on behalf of the Company and shall refrain from any illegal conduct. All Employees and directors have an affirmative obligation to be familiar with specific laws, rules and regulations applicable to their respective areas of responsibility. To the extent that this Code or any other policy of the Company conflicts with any applicable law, rule or regulation, Employees and directors of the Company shall comply with such law, rule or regulation.

- Insider Trading. Federal and state securities laws prohibit trading (purchase or sale) of equity, debt or derivate securities by a person while in possession of material, nonpublic information. "Material nonpublic information" includes all information that is not available to the public at large and to which a reasonable person would attach importance in determining whether to buy, sell or hold a company's equity, debt or derivative securities. Accordingly, Employees and directors of the Company are prohibited from engaging in any transaction involving the purchase or sale of the Company's securities while in possession of material nonpublic information or from passing such information along to others. Employees and directors of the Company are further prohibited from engaging in any transaction involving the purchase or sale of securities of other companies about which an Employee or director learned material nonpublic information as a result of his or her relationship with the Company or from passing such information along to another. Employees and directors should review the Company's Insider Trading Policy for more information with respect to these matters.

*     *     *

**Public Communications:** It is the policy of the Company to provide timely, accurate and complete information in response to public requests in a manner consistent with the Company's obligations to maintain the confidentiality of confidential and/or proprietary knowledge, prevent the selective disclosure of market-sensitive financial data and comply with the requirements of Regulation FD as promulgated by the United States Securities and Exchange Commission.

To ensure compliance with this policy, any Employee or director who is contacted by the press, any member of the financial community (i.e. analysts, institutional investors, or investment advisors) or any other outside organization or individual shall not provide any information to such parties with regard to the Company's business, including without limitation, information regarding overall business trends, business in different geographies, pricing, suppliers, new products or technologies and lawsuits or disputes, and shall direct all such inquiries to the Company's General Counsel.

### D.      Carbonite's Insider Trading Policy

44.      Carbonite's Insider Trading Policy applies to all the Company's officers, employees, consultants, and directors, as well as members of their immediate families and their households.  According to the policy: "It is the policy of the Company that no Covered Person shall misuse Material Nonpublic Information obtained in connection with the Covered Person's relationship with the Company."  It continues, in relevant part:

> 1. <u>No Trading based on Material Nonpublic Information</u>.  No Covered Person shall engage in any transaction involving a purchase or sale of the Company's Securities (including any offer to purchase or sell) while the Covered Person possesses Material Nonpublic Information concerning the Company.  The period during which this prohibition applies begins on the date that the Covered Person acquires or has access to any Material Nonpublic Information concerning the Company, and ends at the close of business on the first Trading Day following the date of public disclosure of such information, or at such time as such nonpublic information ceases to be material. The term "Trading Day" means a day on which national stock exchanges and the NASDAQ Stock Market are open for trading.

*       *       *

> 4. <u>Definition of Material Nonpublic Information</u>.      "Material Nonpublic Information" means information that is both material and nonpublic.  *Information should be regarded as "material" if a reasonable person would attach importance to such information in determining whether to buy, sell or hold a company's equity, debt, or derivative securities*.  It is not possible to define all types of material information.  *However, by way of illustration and not limitation, the following types of information may be material:*

> • Financial results, quarterly or annual reports;
> • *Projections of future earnings or losses*;
> • Pending or proposed mergers, acquisitions, divestitures or joint ventures;
> • *Information regarding a company's products under development*;
> • Impending bankruptcy or financial liquidity problems;
> • Gain or loss of a significant customer or supplier;
> • New product or service announcements of a significant nature;
> • *Significant product or service problems, defects or modifications*;
> • Significant pricing changes;
> • Stock splits;
> • New equity or debt offerings;
> • Actual or threatened litigation; or
> • Changes in senior management.

18

Information is considered to be "public" if it has been disseminated such that it is available to investors in the market at large or if it has become a matter of public record as a result of governmental filings.

(Emphasis added in bold and italics).

### E. Additional Fiduciary Duties of the Audit Committee Defendants

45. In addition to the fiduciary duties discussed above, the Audit Committee Defendants owed specific duties to Carbonite under the Audit Committee's Charter (effective July 20, 2011) (the "Audit Charter"). According to the Audit Charter, the Audit Committee "shall assist the Board with the oversight of the Company's corporate accounting and financial reporting processes, the audits of its financial statements and its internal control processes."

46. The Audit Charter charges the Audit Committee Defendants with the following duties and responsibilities, among others:

> 11. Earnings Releases. The Committee shall discuss generally the type and presentation of information to be disclosed in the Company's earnings press releases, as well as financial information and earning guidance provided to analysts, rating agencies and other third-parties. The Committee shall approve all press releases containing financial information regarding the Company prior to dissemination.
>
> 12. Management's Discussion and Analysis. The Committee shall discuss with the Company's management and the independent auditor the Company's financial statements, including the Company's disclosures in the "Management's Discussion and Analysis of Financial Condition and Results of Operations" section of filings made by the Company pursuant to the Securities Exchange Act of 1934, as amended (the "Exchange Act").
>
> Controls & Procedures
>
> 13. Oversight. The Committee shall coordinate the Board's oversight of, and ensuring compliance with, the Company's internal control over financial reporting and disclosure controls and procedures. The Committee shall receive and review the reports of the Chief Executive Officer and Chief Financial Officer of the Company required by Rule 13a-14 of the Exchange Act.
>
>         \*       \*       \*
>
> 18. Risk Management. The Committee shall review and discuss the Company's policies and processes with regard to risk assessment and risk management,

including guidelines and policies to govern the process by which the Company's exposure to risk is handled, and recommend any changes to such guidelines and policies to the Board.

## V.    BREACHES OF DUTIES

47.    The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Carbonite, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware, or reckless in not being aware, posed a risk of serious injury to the Company.

48.    The Individual Defendants breached their duty of loyalty and good faith by allowing each other to cause, or by themselves causing, the Company to make improper statements in Carbonite's press releases, public filings, and other public statements relating to the Company's Server Backup VM Edition and the Company's current operations and future outlook.   The Individual Defendants knew or were reckless in not knowing that, *inter alia*, the Company's Server Backup VM Edition faced many undisclosed material problems that would prevent the Company from closing significant deals, expanding its market, and meeting its publicly-disclosed financial guidance.   These unlawful practices wasted the Company's assets and caused Carbonite to incur substantial damage.

49.    The Board members also had a duty to comply with and oversee compliance with the Company's Governance Guidelines.  The Individual Defendants breached their duty of loyalty and good faith by not complying with the Governance Guidelines by, among other things, failing to adequately oversee management of the Company, failing to establish an environment that promotes timely and effective disclosure, failing to adequately oversee strategic and financial risks and exposures concerning the Company's new product offerings, and failing to evaluate and ensure

the integrity of the Company's accounting and financial and reporting systems and internal controls.

50.     The Board members had a duty to properly oversee compliance with Carbonite's Code of Conduct.  The Code of Conduct, which applies to all officers, employees, and directors, requires compliance with all applicable laws, rules, and regulations, and specifically bans insider trading.  It additionally requires all public communications on behalf of Carbonite be timely, accurate, and complete.  As described herein, the Individual Defendants breached their duty of loyalty and good faith by failing to properly oversee compliance with the Code of Conduct by, *inter alia*, making or allowing to be made the improper statements described herein and engaging in or allowing others to engage in violations of law including prohibited insider trading.

51.     The Insider Selling Defendants further breached their duty of loyalty by selling Carbonite stock on the basis of material, adverse nonpublic information before that information was revealed to the Company's shareholders.

52.     The Audit Committee members had a duty to review and approve all press releases containing financial information regarding the Company prior to dissemination, including those made on February 7 and May 2, 2019.  They also had a duty to properly oversee Carbonite's public disclosure controls and procedures, as well as its risk assessment and management, and internal control functions.  As described herein, the Audit Committee Defendants breached their duty of loyalty and good faith by approving and otherwise allowing the improper statements, and by failing to properly oversee Carbonite's compliance with its public disclosure controls and procedure, risk assessment and management, and internal control functions.

53.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of Carbonite, were able to and did, directly or indirectly, exercise control

21

over the wrongful acts complained of herein.  The Individual Defendants also failed to prevent the other Individual Defendants from taking such improper actions.

## VI.  CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

54.   In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct alleged herein as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

55.   During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) deceive the investing public, including shareholders of Carbonite, regarding the Company's future prospects and the Individual Defendants' management and oversight of Carbonite's operations; and (ii) enhance the Individual Defendants' executive and directorial positions at Carbonite and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions.   In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

56.   The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct.  During this time, the Individual Defendants caused the Company to issue improper public statements.

57.   The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, and to conceal adverse information concerning the Company's operations and future prospects.

58.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly release improper statements.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

59.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## VII.   SUBSTANTIVE ALLEGATIONS

### A.     Company Background

60.     Founded in 2005 by David Friend and Jeff Flowers, Carbonite initially provided online backup services primarily to consumers.  As the Company grew, it raised more than $67 million in venture funding and eventually had its initial public offering in 2011.

61.     After joining Carbonite as President and CEO in December 2014, defendant Ali sought to reposition the Company from principally a seller of consumer products into a provider of more complex business offerings targeting small and medium-sized businesses (SMBs) and enterprises.  Through acquisitions, research and development, and channel partnerships, Ali aimed to build the de facto data protection leader for SMB and midmarket customers.

62.     In late 2015, Carbonite announced that it would acquire EVault, formerly a division of Seagate Technology, for $14 million in cash.  At the time, Carbonite claimed it was buying "a leading provider of business continuity and disaster recovery solutions" designed for SMBs and

small enterprises.  This addition expanded Carbonite's data protection portfolio to include hybrid backup and disaster recovery services for larger businesses.

63.     About a year later, in January 2017, Carbonite expanded into enterprise-grade solutions with the acquisition of Double-Take Software for $65.25 million in cash and stock.  The acquisition reportedly enhanced Carbonite's existing suite of data protection solutions for small and midsize businesses with high availability technology that significantly minimizes downtime associated with data recovery.

64.     In August 2017, Carbonite announced that it had acquired Seattle-based Datacastle, which provides endpoint backup and analytics software, to expand the Company's endpoint business with larger companies.

65.     On February 13, 2018, Carbonite announced that it had entered into a definitive agreement to acquire Mozy, Inc. from a subsidiary of Dell Technologies Inc. for $145.8 million in cash.  Mozy is a cloud-based secure backup solution for enterprises to automatically sync data and recover it easier when lost.  According to Carbonite, the deal expanded its customer base and better positioned it to offer its data protection platform to every segment of the market.

66.     As Ali pushed forward with and promoted Carbonite's transformation, investors liked what they saw and drove the Company's share price from about $7 per share in February 2016 to $43 per share in early September 2018.  With this string of successes came additional pressure on Ali and Carbonite's senior management to continue the Company's winning streak.

### B.     Carbonite's Server Backup VM Edition

67.     The Individual Defendants knew that the Company's transformation would also require it to successfully develop and expand its own products and integrate those of its acquisitions.

24

68.     On October 18, 2018, Carbonite announced an expansion of its services with the launch of its Server Backup VM Edition for Managed Service Providers (MSPs).  MSPs are entities that remotely manage a customer's IT infrastructure and/or end-user systems.  A "VM" or virtual machine is a software program or operating system capable of performing tasks such as running applications and programs as if it were a separate computer.  A VM, usually known as a "guest," is created within another computing environment referred as a "host."  Multiple VMs can exist within a single host at one time.

69.     Carbonite's Server Backup VM edition was designed to allow MSPs to protect virtualized environments both locally and in their own cloud.  Carbonite described how it works as follows:

> The local backup server connects to the host and takes an agentless backup of the selected VMs. The backed-up data is compressed, reducing the data footprint and accelerating cloud uploads (since less data goes to the cloud). Once seeded, the server performs incremental backups, recording only changes. The backup server updates on schedule every 15 minutes—or longer if so configured—while securely sending changes to the cloud on a separate schedule.

70.     The following slide prepared by Carbonite summarizes its Carbonite Server Backup VM Edition:



71.     In introducing the Server Backup VM Edition, Carbonite hoped to compete against such companies as Veeam, which pioneered the market for VM data protection.

72.     In conjunction with the launch of the Server Backup VM Edition, Carbonite also introduced its "refreshed" and expanded Data Protection Console which would be a "purpose-built backup for virtual machines (VMs) and enable[] businesses to select, manage and recover their VM data from a single location, the Carbonite Data Protection Console."  The combination of the Server Backup VM Edition with the refreshed Data Protection Console would permit Carbonite to offer to its customers "a fully integrated service that protects virtualized environments both locally and in their own cloud."

73.     The following slide prepared by Carbonite summarizes its Data Protection Console:



74.     In trumpeting the new product launch, defendant Ali stated, in relevant part, in an October 18, 2018 press release:

> The delivery of Carbonite Server VM Edition simultaneously with the launch of our flagship Carbonite Data Protection Console is the culmination of one of our largest cross-functional efforts, led by our exceptional engineering

organization . . . .  Our customers and partners are eager to have an integrated and easy to use data protection solution for both physical and virtual servers.

75.     On November 1, 2018, when Carbonite released its third quarter 2018 financial results for the period ended September 30, 2018, defendant Ali made it clear that the launch of the Carbonite Server Backup VM Edition was integral to the execution of Carbonite's "strategic plan" to "address all of the market's most pressing data protection needs."

76.     On the same day, Carbonite held a conference call with analysts and investors to discuss the Company's earnings and operations.  During his prepared remarks, defendant Ali provided more detail with respect to the significance of the Carbonite Data Protection Console and the Server Backup VM Edition:

> While I am very pleased with our financial results, what was even more impressive this quarter was the great progress we have made with respect to our longer-term strategic priorities.  We are successfully executing on our longer-term product strategy and vision, and we have achieved some important milestones on that exciting task.

> During the quarter the team launched a Carbonite Data Protection Console, a unified platform to easily manage all of a business's data protection needs.  ***This was one of the single biggest development efforts in the company's history and is a very important milestone in our evolution to become the leading data protection company for businesses***.  Built with a modern architecture and a clean, elegant user experience, the platform is fully extensible and incredibly easy to use.  There are several screenshots available in the accompanying slide deck.

> Over time, the console will serve as the unifying platform for all of our data protection offerings, supported by the robust product engines and highly efficient and scalable Carbonite cloud infrastructure.  As Carbonite continues to evolve the console to provide businesses an integrated management experience for their entire IT footprint, IT managers will be able to log into the console to manage the data protection of all their systems, including physical, virtual, cloud and endpoints.

> ***Carbonite Server, which includes new purpose-built server backup for virtual machines, is the first Carbonite solution directly integrated into the new platform. This significantly improves our performance for backing up virtual environments and makes us extremely competitive going after that market***.

> Businesses today need data protection for all their systems, from legacy systems to those that are fully virtualized. In a world where data sprawl continues at a rapid

pace, one where workloads are frequently moving, businesses also need a streamlined management experience so they can quickly and easily optimize backup and recovery performance, no matter where the data resides.

With our newest release, we offer robust, all-in-one server protection for physical, virtual, and legacy systems, including agentless VM backup for VMWare and Hyper-V. No longer do you need to choose different solutions for physical and virtual. This combined solution makes it much easier for midmarket companies to buy and deploy.

We're also clearly differentiated from others in the market with our integrated cloud and storage appliances available through a Hardware-as-a-Service offering. These are big product releases and are the first visible results of our significant internal development efforts.

(Emphasis added).

77.    During this conference call, defendant Ali also made it clear that the launch of

Carbonite Server VM Edition would be a key driver in the growth of Carbonite's financial

performance for 2019 and 2020. This is illustrated in the following exchange:

[**Analyst:**] Yes, I wanted to focus on kind of a longer-term question. I know you just had sort of a strategic offsite with some of the key people in your organization, just brainstorming. As far as what you come out of that meeting with, really, really excited about for 2019. Is it around, "Hey, we've now got the Carbonite Data Protection Console"? Is it around the Mozy conversion? Is it around the M&A landscape? If you could just talk about one or two things about which the team is really excited for 2019 and beyond.

[**Defendant Ali:**] Yes, Eric, no, thank you. It's great. So first of all, we do two strategic offsites a year, and I'll tell you where we did them. The first one we did at Converse, which is a Nike company. And that was fun. And then the second we actually did at Iron Mountain, which they're a great partner.

And going into '19 and '20, a big part of it is we have a platform now that can deliver data protection across the board. And we have a user experience that allows you to continue to very easily -- allows you to cross-sell, allows you to provide the APIs into the MSPs, which we never had before. And so a big part of the strategy was focused on, "How do we leverage that now?" We're sort of at the point that we've been building to for 4 years now. We have it. We're actually starting to see some of the impact of having that platform. We're starting to see deals that are bigger than the deals that we have seen before, in part because customers are buying multiple products. Just last week, we had a deal that was 3x our normal deal size, and it had all 3 products in it. The customer bought all 3 things together.

And so a lot of it has to do with continue to integrate our solutions, integrate our IT platform and leverage that to automate.  And as we look at our close rates across the different size of the deal, how do we now optimize our close rates across the entire spectrum of deal sizes that we have?

So yes, it's now building -- getting the benefits from the platform that we have been creating for 4 years.  So thanks for asking.  It was very exciting.

[Analyst:] And the MSP portion, if I could just ask a follow-up, what is kind of MSP as a percent of your business bookings, or maybe as just a percent of your total bookings, and where do you think that goes over time?

[Defendant Ali:] Yes, I'm going to have Anthony answer it, but I want to tell you it's not big, but it is growing, and it's growing nicely.  And it's actually amazing how successful we've been with the MSP partners without really providing them the APIs, the tooling, what they actually need.  Now we have what they need, and we had 30 MSPs, sizable ones here at Carbonite last week, and they just love what we had.  Each one of these products have the APIs that they need, and they can deploy our stack in their data centers if they choose, or they can run it -- they can integrate with the APIs and run it in our data center.  It's very exciting.  I'll turn it over to Anthony to talk about the MSPs that we have today.

[Defendant Folger:] Yes, thanks, Mohamad.  I would say MSPs are probably sub-10% of our business, but I think growing very quickly as a channel for us.  So we may at some point in the future cross that 10% threshold, but sub-10% today.

## C. The Individual Defendants Make a Series of Improper Statements to Hide the Known Problems with Carbonite's New Product Offerings

78.     On February 7, 2019, Carbonite issued a press release announcing its full year 2018 financial results and provided financial projections and guidance for fiscal 2019.  In the press release, defendant Ali commented on the results, stating, in relevant part:

We delivered on our strategic priorities in 2018 . . . .  We significantly strengthened our product platform and introduced one of the most complete Software-as-a-Service data protection portfolios in the market; we did this while successfully continuing our acquisition integration work and driving meaningful improvements in profitability.  In 2019 we plan to build upon these efforts, further expanding our data protection platform and delivering a broader set of solutions to our customers, while we invest aggressively in our distribution channels with a focus on driving continued growth and profitability.

The press release continued, in relevant part:

**Business Outlook**

Based on the information available as of February 7, 2019, Carbonite expects the following for the first quarter and full year of 2019:

First Quarter 2019:

|  | Current Guidance (2/7/2019) |
| --- | --- |
| GAAP Revenue | $76.5 - $77.5 million |
| Non-GAAP Revenue | $77.0 - $78.0 million |
| Adjusted EBITDA | $20.0 - $21.5 million |

Full Year 2019:

|  | Current Guidance (2/7/2019) |
| --- | --- |
| GAAP Revenue | $468 - $482 million |
| Non-GAAP Revenue | $488 - $502 million |
| Non-GAAP Gross Margin | 80.5% - 81.5% |
| Adjusted EBITDA | $129 - $134 million |

Carbonite's expectations of adjusted EBITDA for the first quarter and full year of 2019 excludes the impact of interest expense, net, income taxes, depreciation, amortization, purchase accounting adjustments on acquired deferred revenue, stock-based compensation expense, litigation-related expense, restructuring-related expense and acquisition-related expense from net income (loss).  The "Business Outlook" above assumes nine months of contribution from Webroot.

79.    On February 7, 2019, Carbonite also announced that it would acquire Webroot Inc. for $618.5 million in cash.  The Company claimed that the "combined business will address a top vulnerability of businesses - the endpoint - with a comprehensive approach to protection through cloud-based cybersecurity, paired with cloud-based backup and recovery."  Further, defendant Ali commented: "The acquisition of Webroot dramatically accelerates our progress towards becoming the leading data protection company."

80.     On May 2, 2019, Carbonite continued projecting positive financial results for fiscal 2019 when it released its first quarter 2019 financial results and increased its projections for fiscal 2019 for Non-GAAP Revenue to a range of $491 million to $505 million, an increase from its prior guidance of $488 million to $502 million. In the press release, defendant Ali further stated, in pertinent part:

> We had a good first quarter and a strong start to 2019, with first quarter revenue and adjusted EBITDA above the high-end of our guidance . . . .  We are excited to have closed the Webroot acquisition as planned and started the integration process. Together, these leading solutions will provide robust protection of data, devices and networks for our partners and customers.

81.     Also, on May 2, 2019, Carbonite held a conference call with analysts and investors to discuss the Company's earnings and operations.  During his prepared remarks, defendant Ali represented that the Company delivered better-than-expected revenue driven by strong performance of Carbonite data protection solutions stating in pertinent part:

> We've delivered better-than-expected revenues in the first quarter, driven by strong performance of our Carbonite data protection solutions as well as the benefit of having closed the Webroot transaction a few days before the end of the quarter.  In addition to delivering better-than-expected revenue, we also exceeded our adjusted EBITDA guidance and reported strong earnings per share and free cash flow.
>
> *       *       *
>
> During the first quarter, we successfully closed several larger customer transactions and we continue to see large deal momentum in the pipeline, primarily on the data protection side of the business.  The ease-of-use and the power of our solutions combined with our award-winning customer service creates an opportunity to serve these larger customers, while we continue to focus on our core end market, which is small and midsized business.
>
> *       *       *
>
> We have the right product portfolio to serve the broader set of businesses like these 2 great organizations, and we have the incredible product, ease of use that businesses have come to know and expect.  Our focus continues to be on bringing all of our products together under the unified data protection platform to continue to deliver great value to the market, and we'll be sure to update everyone as we make progress throughout 2019.

31

82.     During the call, defendant Folger provided the Company outlook, stating in part:

Now turning to our outlook.  As I think about the growth profile of our data protection business, I continue to expect low single-digit revenue growth in 2019 with growth in subscription revenue, partially offset by a decline in our non-subscription revenue.  Consistent with our prior outlook, I expect our endpoint security business to continue growing in the low double digits. Combined that should produce mid-single-digit revenue growth in the near term with the opportunity to accelerate, driven by additional focus on investment in our indirect channels, successful cross-selling and realizing revenue synergies from our combination with Webroot.  For the second quarter, we expect GAAP revenue to be in the range of $119 million to $123 million. This includes the impact of purchase accounting adjustments on deferred revenue.  Non-GAAP revenue in the range of $133 million to $137 million with the large sequential increase driven by a full quarter of Webroot contribution, and adjusted EBITDA in the range of $34 million to $36 million.

83.     Further, during the question and answer session, defendant Ali talked about the

excitement from their products and their channel, stating in pertinent part:

[Analyst:] It's really good to hear the success on large deals on the data protection side.  I would imagine some of that's due to the unified data protection platform. But I guess can you put a finer point on sort of the success there and maybe sort of how you think about the pipeline of these larger deals?  And because I imagine some of the sales cycles can be little bit longer there.  But just a little bit more color on sort of how you're thinking about that side of your business.

[Defendant Ali:] Yes, I'll tell you a little bit, and then Anthony can add to it.  So actually, these larger deals are Carbonite endpoint deals typically.  As Anthony mentioned, last year we launched a new endpoint product.  And this endpoint product gives us scalability beyond anything that we had before.  The product that we had previously really was a fit for a company up to 25 employees.  Beyond that, there were scalability issues and mostly deployment and manageability issues.  It wasn't built for large-scale centralized management mostly.

This new product that we have out there, I mean has these excellent features up and down, right, and sort of has everything that you need.  And this product, it does core backup, it does ransomware protection.  It does legal hold.  If you lose the device, you can locate it on a map.  If you lose the device, you can remotely wipe it.  So it's really a full-feature product, and it can scale to a business of up to 2 million customers.  So it's extremely, extremely scalable.  It's globally deployable.  So if you're a business with operations in 50 countries, it can be deployed.

And so what we've seen is that some of these newer partners that we've brought on board like Dell and some of the other ones that have access to a customer set that

ranges from the SME to the enterprise, they are bringing to us these -- some of these larger deals.  And they're exciting, and we're using the same product to fulfill those deals.  But you're right.  I mean those do have longer sales cycles, and we put a small team in place to work those longer sales cycle deals.  But at the end of the day, though, the product set that we have, our focus is really on the SME market.  And I think with this particular product, it does scale up and down, and we do have a channel that can sell it.  So it's exciting in that regard.  Does that answer the question?

84.     For his part, defendant Folger commented that they were seeing "good returns from [] channel partners," and that the pipeline was building "quite nicely" around these partners, as reflected in the following exchange:

[**Analyst:**] Yes, it does.  Yes.  And then maybe as a somewhat related question, you mentioned channel partners a couple of times in your answer.  Given Webroot's focus more on the MSP side and you guys have a channel focus, you highlighted additional partner investments you guys are making.  I think you've even highlighted Veritas.  How do you kind of think about, from a spending perspective, the balance between leveraging MSP, sort of a business that you're still trying to probably get your arms around, but also sort of investing in channel?  I mean is there sort of like a trade-off of trying to balance the 2?

[**Defendant Folger:**] Yes, and great question. So at the high level, you can think about Webroot as having a channel of 14,000 MSPs and Carbonite having a channel of 10,000 VARs or resellers, and some of them happen to be very big like Dell or a CDW or a Veritas, and some of them are very small.  So we continue, on the data protection side, the Carbonite side to invest in those channel partners because we're seeing good returns from those channel partners, especially now that we have the new portfolio of products, and in 2019 we will be unifying them under the console.  So now that we have the portfolio, we're putting the dollars to enable the partners.

One of the things -- in Q4, I think one of the things that happened in Q4 was that we had a lot of new products but we probably didn't spend enough to enable the partners.  And now, we are investing behind those partners so they are enabled.  And we are seeing the pipeline build quite nicely around those partners.  But those are not MSP partners, right?  That's sort of the -- I'd call them all VARs of some sort or the other.

Once we have -- now those VARs are actually interested in selling Webroot.  And so the enablement that we're doing behind those partners on the data protection product will be extensible to enabling them to sell Webroot security products, right?  And Webroot has multiple security products. It has the endpoint security, but it also has security awareness training, has DNS, they have Wi-Fi. So they have 4 products there that could -- at the right time, could go into the VAR portfolio. And then on the flip side, as we enable Carbonite endpoint and Carbonite Server, integrate that

with the RMM dashboard, the MSPs will start being able to the sell that in 2020. So the investments that we're making on the channel partners on the data protection side is important for the new products that we brought to market but will also pay dividends once we enable them on the Webroot products.

85.     The statements referenced above in ¶¶ 78, 80-84, above were materially false and misleading when made because they misrepresented and failed to disclose the following Undisclosed Facts, which were known to the Individual Defendants or recklessly disregarded by them: (i) that Carbonite's Server Backup VM Edition was of poor quality and technologically flawed; (ii) that Carbonite was receiving poor reviews and complaints from customers about the Server Backup VM Edition; (iii) that the poor quality and technological flaws of the Server Backup VM Edition was acting as a "disruptive" factor throughout the Carbonite salesforce and keeping that sales organization from closing opportunistically on several larger deals during fiscal 2019; and (iv) as a result, Carbonite's financial guidance lacked a reasonable basis when made and the Company's other public statements were materially false and misleading at all relevant times.

### D.     The Truth Gradually Emerges

86.     On July 25, 2019, Carbonite issued a press release announcing its second quarter 2019 financial results for the period ended June 30, 2019.  In this release, Carbonite announced the resignation of defendant Ali, effective immediately, and dramatically reduced its financial guidance for fiscal 2019 for: (i) GAAP revenue, to a range of $443.5 million to $448.5 million, a decrease from its prior guidance of $457 million to $471 million; and (ii) non-GAAP revenue, to a range of $477.5 million to $482.5 million, a decrease from its prior guidance of $491 million to $505 million (a decrease of $18 million on analyst consensus).

87.     On the same day, Carbonite held a conference call with analysts and investors.  In his opening remarks, defendant Folger offered an explanation for the dramatically reduced financial guidance for fiscal 2019, stating, in relevant part:

So what happened? ***Well, in the second quarter, we experienced challenges in our data protection business related to products and go-to-market effectiveness. Towards the end of the quarter, we determined that the virtual server edition of our server backup product was not at the level of quality that customers have come to expect from Carbonite.***

Many of you will remember that this was newly launched in Q3 of 2018 and something we expected to meaningfully contribute to revenue starting in the back half of 2019 and through 2020. ***While we assessed the best path forward, we have removed any growth expectations associated with virtual server edition from our short-term outlook.  Our go-to-market efforts were also challenged in the second quarter***.

Compared to Q1, we converted pipeline at a lower rate and also closed fewer large deals.  While we saw encouraging results from our channel, it was not enough to offset these challenges.  With new leadership in place, we are already taking steps to improve our performance.  However, our Q2 trends form a new baseline that we are flowing through our model, resulting in our lower guidance for the year.

(Emphasis added).

88.     As explained by Carbonite's interim CEO and President, Stephen Munford, the poor quality and technological flaws of the Server Backup VM Edition were acting as a "disruptive" factor throughout the Carbonite salesforce and keeping that sales organization from closing opportunistically on several larger deals during fiscal 2019.  Munford stated, in pertinent part:

Firstly, as you mentioned, the problems that our virtual server launched and us pulling down from the market, I mean, ***we launched the product in a market that is growing and there's a lot of demand.  But we just didn't have the quality we needed. And we need to step up.  And that is disruptive and it's, yes, at least part, if not all, the reason for the lower guide.  But it's part of that and is disruptive to the sales organization.  So that is not less about being in a good market.  It's more about not executing on your product strategy.***

(Emphasis added).

89.     On this news, Carbonite stock fell $5.89 per share, or 24.6%, to close at $18.01 per share on July 26, 2019, representing a loss of more than $200 million in market capitalization.

90.     On August 14, 2019, Carbonite announced that the Company and Paul Mellinger had mutually agreed that Mellinger would step down from his position as SVP Sales, effective that same day.

91.     On August 15, 2019, Carbonite announced that Danielle Sheer had resigned from her positions as General Counsel and Corporate Secretary of the Company, effective September 13, 2019.

92.     On August 26, 2019, Norman Guadagno notified Carbonite of his resignation as the Company's SVP, Marketing, effective September 6, 2019.  After Guadagno's resignation, four of the six Carbonite Executive Officers listed in the Company's 2019 Proxy Statement had resigned or been replaced during July and August 2019.  The only two remaining Executive Officers are defendant Anthony Folger and Robert L. Beeler, SVP, Products & Engineering.

### E.     Insider Selling

93.     The false and misleading statements made by Carbonite and the Individual Defendants artificially inflated the price of Carbonite common stock and allowed defendants Ali and Folger to sell more than $1.5 million of their individual holdings between February and July of 2019.

94.     Defendant Ali and Folger's trades were in violation of their fiduciary duties to Carbonite and in violation of the Company's Code of Conduct and Insider Trading Policy. Carbonite's Insider Trading Policy, under the "Mandatory Provisions" section, states: "No Covered Person shall engage in any transaction involving a purchase or sale of the Company's Securities (including any offer to purchase or sell) while the Covered Person possesses Material Nonpublic Information concerning the Company."

95.     As Carbonite's CEO and CFO, Ali and Folger were aware of the ongoing problems with the Server Backup VM Edition and the resulting effect on current sales and the Company's

guidance.  Not only were such issues obvious to Carbonite's top management, but Ali and Folger both had intimate knowledge of every aspect of Carbonite's business including its development of the Server Backup VM Edition, they were directly involved in the day-to-day operations of the Company at the highest levels, they were provided (and had access to) the most up-to-date financial information at all times, and they were privy to confidential proprietary information concerning the Company's business and operations.  Indeed, Ali and Folger frequently spoke on investor calls, responded to analyst questions, and otherwise demonstrated their knowledge of Carbonite's Server Backup VM Edition, the Company's financial guidance, and other related matters.

96.    Ali and Folger were aware that the ongoing problems with the Server Backup VM Edition and the resulting effect on sales were material to investors given the product's importance to the Company.  In slashing revenue guidance by $18 million on July 25, 2019, defendant Folger admitted that a significant portion of that amount was directly attributable to the flawed Server Backup VM Edition.  Defendant Munford disclosed that that these product issues affected Carbonite's overall sales organization "[a]nd that is disruptive and it's, yes, at least part, if not all, the reason for the lower guide."

97.    Defendant Ali undertook the following insider sales of his personally-held Carbonite shares during the Relevant Time Period, in violation of the Company's Insider Trading Policy:

| DATE | SHARE PRICE | NUMBER OF SHARES | PROCEEDS |
|---|---|---|---|
| 2/14/2019 | $24.70 | 21,511 | $531.321.70 |
| 2/15/2019 | $23.76 | 7,998 | $190,032.48 |
| 3/14/2019 | $24.45 | 4,000 | $97,800.00 |
| 3/18/2019 | $24.46 | 4,000 | $97,840.00 |
| 5/31/2019 | $23.50 | 4,000 | $94,000.00 |
| 6/17/2019 | $23.96 | 4,000 | $95,840.00 |
| | | | |
| TOTAL | | 45,509 | $1,106,834.18 |

98.     Defendant Folger undertook the following insider sales of his personally-held Carbonite shares during the Relevant Time Period, in violation of the Company's Insider Trading Policy:

| DATE | SHARE PRICE | NUMBER OF SHARES | PROCEEDS |
|------|-------------|------------------|----------|
| 6/3/2019 | $23.42 | 9,776 | $228,953.92 |
| 7/1/2019 | $25.84 | 7,891 | $203,903.44 |
| | | | |
| TOTAL | | 17,667 | $432,857.36 |

**F.     The Director Defendants Made False and Misleading Statements in Carbonite's 2019 Proxy Statement**

99.     Plaintiff's allegations with respect to the misleading statements in the 2019 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of these defendants, and they do not allege and do not sound in fraud.   Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

100.     On April 5, 2019, Carbonite issued its Proxy Statement for its 2019 Annual Meeting of Stockholders to be held on Monday, May 20, 2019 ("2019 Proxy").   In the 2019 Proxy, the Director Defendants solicited shareholder votes to, among other things, reelect defendants Kane, Munford, and Connly to the Board.   In support of their bid to reelect defendants Kane, Munford, and Connly, the Director Defendants highlighted their duties and their supposed successful oversight of the Company, as set forth below.   The Director Defendants negligently issued misleading statements with respect to these solicited votes.

101.     In a section entitled "Board Responsibility; Risk Oversight" the 2019 Proxy stated in relevant part:

Our Board is responsible for, among other things:

• Oversight of our business;

• Review of the performance of our chief executive officer; and

• Review and approval of our significant financial objectives, plans, and actions.

The Board conducts an annual self-evaluation, an annual peer evaluation, a review of the committee structure, and an assessment of its compliance with our governance principles.  In fulfilling our Board's responsibilities, directors have full access to our management and independent advisors.

While the Audit Committee is primarily responsible for overseeing our risk management function, our entire Board is actively involved in risk management oversight.  For example, our Board engages in periodic discussions with such Company executive officers as our Board deems necessary, including the chief executive officer, independent chairman, chief financial officer and general counsel. In addition, our Compensation Committee reviews compensation policies and practices as they relate to risk management practices and risk-taking incentives and our Information Security Risk Committee reviews technology and infrastructure security risks.  We believe that the leadership structure of our Board supports effective risk management oversight.

102.    In a section entitled "Audit Committee" the 2019 Proxy states in relevant part:

Our Audit Committee oversees our accounting and financial reporting process, the audit of our financial statements, and our internal control processes.  Among other matters, the Audit Committee:

• evaluates the independent registered public accounting firm's qualifications, independence, and performance;

• determines the engagement, retention, and compensation of the independent registered public accounting firm;

• reviews and approves the scope of the annual audit and the audit fee;

• discusses with management and the independent registered public accounting firm the results of the annual audit and the review of our quarterly financial statements, including the disclosures in our annual and quarterly reports filed with the SEC;

• approves the retention of the independent registered public accounting firm to perform any proposed permissible non-audit services;

• reviews our risk assessment and risk management processes;

• establishes procedures for receiving, retaining and investigating complaints received by us regarding accounting, internal accounting controls, or audit matters;

• monitors the rotation of partners of the independent registered public accounting firm on the Carbonite engagement team as required by law;

• reviews our critical accounting policies and estimates; and

• oversees any internal audit function. Additionally, the Audit Committee reviews and approves related person transactions and reviews and evaluates, on an annual basis, the Audit Committee charter and the committee's performance.

*       *       *

The Audit Committee operates under a written charter, a copy of which is posted on our website at http://investor.carbonite.com/corporate-governance.

103.    As set forth above at ¶ 46, above, the Audit Committee Charter charges the committee with the following duty, among many others: "The Committee shall approve all press releases containing financial information regarding the Company prior to dissemination."

104.    In a section entitled "Nominating and Corporate Governance Committee," the 2019 Proxy states that the committee's responsibilities include "oversee[ing] compliance with our code of business conduct and ethics."

105.    Accordingly, the 2019 Proxy incorrectly claimed and led reasonable investors to believe that: (i) the Board was engaged in appropriate and active risk oversight of the Company and its significant financial objectives, plans, and actions; (ii) the Audit Committee appropriately reviewed and approved all press releases containing financial information regarding the Company prior to dissemination, including those made on February 7 and May 2, 2019, and exercised appropriate and active oversight of the Company's accounting and financial reporting process, critical accounting policies and estimates, risk management function, and internal control processes; (iii) the Governance Committee engaged in appropriate and active risk oversight over employees' and directors' compliance with Code of Conduct (including its Disclosure and Insider Trading Policies); and (iv) as a result, defendants Kane, Munford, and Connly, as members of the Board and the Audit or Governance Committees, were well-informed about and exercised

appropriate and active oversight over Carbonite's operations, risk management, controls, public disclosures, Code of Conduct, and insider trading.

106. In reality, the Board and its Audit and Governance Committees, which include defendants Kane, Munford, and Connly, did not exercise active and appropriate oversight over the Company's operations, risk management, controls, public disclosures, Code of Conduct, and insider trading. Instead, as described herein, the Board made or allowed to be made improper statements in Carbonite's press releases, public filings, and other public statements; it failed to oversee compliance with the Code of Ethics, including its Insider Trading provision; it failed to implement a functioning risk management processes designed to address significant risks to the Company; it utterly failed to ensure compliance with applicable securities laws through implementation of functioning disclosure controls and procedures; and it made little or no effort to adequately oversee the Company's significant financial objectives, plans, and actions, including those associated with the Server Backup VM Edition. Accordingly, the Director Defendants were negligent in including these misleading statements in the 2019 Proxy.

107. The misleading statements in the 2019 Proxy were material to shareholders since they directly or indirectly concerned the Director Defendants' oversight associated with the Company's new Server Backup VM Edition product along with the refreshed Data Protection Console. Carbonite's management touted this as "one of the single biggest development efforts in the company's history" and concluded that it was "a very important milestone in our evolution to become the leading data protection company for businesses." Moreover, given the importance of this new product to Carbonite, its problematic rollout would necessarily be apparent to senior management and the Board, thereby making any related oversight over Carbonite's disclosure, insider trading, and risk management by the Board especially straightforward. Conversely, Kane,

41

Munford, and Connly's failure to exercise active and appropriate oversight under these circumstances was particularly troubling.

108.    The 2019 Proxy harmed Carbonite by interfering with the proper governance on the Company's behalf that follows the free and informed exercise of the shareholders' right to vote for directors.   Had the 2019 Proxy included appropriate disclosures concerning the Board's oversight failures as described herein, shareholders likely would not have voted to re-elect defendants Kane, Munford, and Connly to Carbonite's Board.   Plaintiff therefore seeks a new 2019 director election on the basis of a special proxy with appropriate corrective disclosures.

109.    The 2019 Proxy further harmed Carbonite in the amount of (i) the costs necessary to issue the appropriate corrective disclosures and to re-run the 2019 director election and (ii) the continued payment of compensation to Kane, Munford, and Connly (and for which new directors would receive less compensation due to, *inter alia*, the proration of any yearly compensation after appointment).

## VIII.   DAMAGES TO CARBONITE

110.    As a result of the foregoing wrongful conduct, Carbonite and the Individual Defendants made improper statements in the Company's press releases, public filings, and other public statements relating to, *inter alia*, the Company's Server Backup VM Edition and the Company's current operations and future outlook.   This misconduct has damaged Carbonite's credibility and caused the Company to lose more than $200 million in market capitalization.

111.    The Individual Defendants' improper course of conduct has also subjected the Company to potentially millions of dollars in damages in connection with the Securities Class Actions.   The Securities Class Actions allege that the Company, Ali, and Folger and certain Individual Defendants violated federal securities laws by repeatedly misrepresenting the Company's Server Backup VM Edition, the Company's current operations, and its future outlook.

112.    As a direct and proximate result of the Individual Defendants' conduct, the Company has expended, and will continue to expend, significant sums of money.  These additional expenditures include, without limitation: (i) costs necessary to issue the appropriate corrective disclosures and to re-run the 2019 director election; (ii) costs incurred from compensation and benefits paid to the Individual Defendants and other members of Carbonite's management, which compensation was based at least in part on Carbonite's artificially-inflated stock price; and (iii) costs incurred in investigating and defending Carbonite and the Securities Class Action Defendants in the Securities Class Actions and any related litigation.

113.    These actions have further irreparably damaged Carbonite's corporate image and goodwill.  For at least the foreseeable future, Carbonite will suffer from what is known as the "liar's discount," a term applied to the stock of companies who have been implicated in misleading the investing public, such that Carbonite's ability to raise equity capital or debt on favorable terms in the future is now and will continue to be impaired.  The Company stands to incur higher marginal costs of capital and debt because of the misconduct.

## IX.    DERIVATIVE ALLEGATIONS

114.    Plaintiff brings this action derivatively in her own right and for the benefit of the Company to redress injuries suffered, and to be suffered, by Carbonite as a direct result of the violations of the federal securities laws, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment by the Individual Defendants.

115.    Carbonite is named as a Nominal Defendant in this case solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

116.    Plaintiff is a current shareholder of Carbonite and has continuously owned such shares since November 2, 2018.  Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in prosecuting this action.

117.    Due to the Board's direct involvement in the wrongdoing, the substantial likelihood of liability its members face, and its members' lack of independence, prosecution of this action, independent of the current Board, is in the best interests of the Company and its shareholders.

118.    The wrongful acts complained of herein subjected, and continue to subject, Carbonite to harm.

## X.    FUTILITY ALLEGATIONS

119.    Plaintiff incorporates by reference all prior paragraphs as if fully set forth herein.

120.    Carbonite's current Board consists of defendants Friend, Munford, Levinson, Daniels, Kane, Krasnow, and Connly.  A majority of these individuals are not disinterested and independent with respect to the acts and omissions alleged herein.  Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile and useless act.

### A.    Demand Is Excused as to Defendants Friend and Munford Because They Lack Independence

121.    The Director Defendants concede in the Company's SEC filings that defendant Friend is not an independent director.  Specifically, in the 2019 Proxy, defendant Friend is not listed as one of the allegedly independent directors.  According to the Director Defendants, based upon information requested from and provided by Friend concerning his background, employment, and affiliations, including family relationships, the Board has determined that Friend has a relationship that would interfere with the exercise of independent judgment in carrying out the

responsibilities of a director and/or that he is not "independent" as that term is defined under the listing requirements and rules of the NASDAQ.

122.    Furthermore, defendant Friend is not an independent director due to his long history as a Co-Founder and an executive with Carbonite.  Friend has served as a member of the Board since he co-founded the Company in February 2005.  He served as CEO from February 2005 to December 2014, as President from February 2005 to September 2007, and again from August 2010 to December 2014.  On December 3, 2014, Friend resigned as President and CEO and became Executive Chairman of the Board, where he served from December 2014 to February 2016.  In these positions, Friend has received and continues to receive substantial monetary compensation and other benefits.  Defendant Friend also continues to be a substantial shareholder in Carbonite, beneficially owning 742,876 shares of common stock (2.2% of outstanding shares) with a value exceeding $10 million.

123.    Under the same factors applied by the Board to Friend, defendant Munford is no longer independent.  On July 25, 2019, Munford executed an "Executive Employment Agreement" whereby he became an employee of the Company, that is, Interim CEO, reporting directly to the Board.  In this position, Munford is paid a Base Salary of $448,761, an incentive bonus of up to 130% of his Base Salary, $2,500,000 in Restricted Stock Units, and additional employee benefits.  Accordingly, Munford is not "independent" as that term is defined under the listing requirements and rules of the NASDAQ.  In this position and via his Board membership, Munford has received and continues to receive substantial monetary compensation and other benefits.

124.    Additionally, when Munford accepted the Interim CEO position he simultaneously resigned from his positions on the Board's Compensation, Corporate Governance, and Information Security Risk Committees since committee members are required to be independent under the

applicable rules and regulations of the SEC, NASDAQ, and/or Section 162(m) of the Internal Revenue Code.

125.   Defendant Friend's and Munford's lack of independence renders them incapable of impartially considering a demand to commence and vigorously prosecute this action.

**B.   Demand Is Excused Because the Entire Board Faces a Substantial Likelihood of Liability for Their Misconduct**

126.   Defendants Krasnow, Daniels, and Kane, as members of the Audit Committee, had a duty to properly review and approve all press releases containing financial information regarding the Company prior to dissemination, including those made on February 7 and May 2, 2019.  They further had a duty properly oversee Carbonite's public disclosure controls and procedures, as well as its risk assessment and management, and internal control functions.  Thus, the Audit Committee Defendants were responsible for knowingly or recklessly allowing the improper statements detailed herein.  The Audit Committee Defendants breached their fiduciary duty of loyalty and good faith by approving and otherwise allowing the improper statements, failing to properly oversee Carbonite's disclosure controls and procedures, failing to properly oversee its risk management function, and failing to review and properly oversee its critical accounting policies and estimates.  For these reasons, defendants Krasnow, Daniels, and Kane face a substantial likelihood of liability for their breach of fiduciary duties, making any demand upon them futile.

127.   Defendants Friend, Munford, Levinson, Daniels, Kane, Krasnow, and Connly breached their fiduciary duties of loyalty and good faith by making or allowing to be made improper statements in Carbonite's press releases, public filings, and other public statements.  In making or allowing these improper statements, defendants Friend, Munford, Levinson, Daniels, Kane, Krasnow, and Connly breached their fiduciary duties.  Accordingly, all the members of the

Board face a substantial likelihood of liability for their breach of fiduciary duties, making any demand upon them futile.

128.     Defendants Kane and Levinson, as members of the Governance Committee which is responsible for coordinating the Board's oversight of the Code of Conduct and compliance therewith, and Friend, Munford, Daniels, Krasnow, and Connly, as members of the Board, breached their fiduciary duties of loyalty and good faith by allowing the Insider Selling Defendants, each of which who were privy to material, adverse nonpublic information concerning the roll out of the Company's Server Backup VM Edition, to trade their personal Carbonite stock holdings on the basis of this information before it was revealed to the Company's shareholders, in violation of the Company's Code of Conduct and applicable laws and regulations.  These breaches are particularly egregious since the Company's insider trading policy specifically states that material nonpublic information may include projections of future earnings and losses, information concerning products being developed, and significant product or service problems.  Accordingly, all the members of the Board face a substantial likelihood of liability for their breach of fiduciary duties, making any demand upon them futile.

129.     Defendants Friend, Munford, Levinson, Daniels, Kane, Krasnow, and Connly violated section 14(a) of the Exchange Act by negligently making material misstatements and omissions in the 2019 Proxy.  It is against public policy to indemnify individuals for violations of section 14(a) of the Exchange Act.  Accordingly, any indemnification provided by the Company to defendants Friend, Munford, Levinson, Daniels, Kane, Krasnow, and Connly does not protect them from their violations.  As a result, defendants Friend, Munford, Levinson, Daniels, Kane, Krasnow, and Connly face a substantial likelihood of liability, excusing a demand.

130.    Any suit by the current directors of Carbonite to remedy these wrongs would also expose defendants Ali, Folger, and Carbonite to liability for breach of fiduciary duties and violations of the federal securities laws in the pending Securities Class Actions and would result in civil actions being filed against one or more of the other Individual Defendants.  If the Board elects for the Company to press forward with its right of action against defendant Ali, Folger, and others in this action, then Carbonite's efforts would compromise its own defense of the Securities Class Actions.

### C.    Demand Is Excused Because Defendants Munford, Kane, and Connly Are Not Sufficiently Disinterested to Consider a Demand

131.    Demand is further excused as to defendants Munford, Kane, and Connly because these defendants are not sufficiently disinterested and independent to decide whether Carbonite should pursue the section 14(a) claims asserted in this action.  These three directors would be subject to a new election and, potentially, immediate ouster from the Board if this claim is successful and new elections ordered.

132.    With knowledge of the undisclosed truth surrounding the Board's oversight failures and the threat this truth posed to these directors' positions on the Board, these directors took action to entrench themselves and perpetuate their control of Carbonite by causing the Company to issue the misleading 2019 Proxy.

133.    In particular, defendants Munford, Kane, and Connly's prospects of remaining in office would have been in serious doubt had the 2019 Proxy included appropriate disclosures, including that the Board made or allowed to be made improper statements in Carbonite's press releases, public filings, and other public statements; it failed to oversee compliance with the Code of Conduct, including its Insider Trading provision; it failed to implement a functioning risk management processes designed to address significant risks to the Company; it utterly failed to

ensure compliance with applicable securities laws through implementation of functioning disclosure controls and procedures; and it made little or no effort to adequately oversee the Company's significant financial objectives, plans, and actions, including those associated with the Server Backup VM Edition.

134.    Had the 2019 Proxy included these disclosures, Carbonite shareholders would likely not have voted to re-elect defendants Munford, Kane, and Connly to Carbonite's Board.

### D.    Demand Is Excused as to Defendants Krasnow and Connly Due to Their Membership on the Compensation Committee

135.    Defendants Krasnow and Connly serve together on the Compensation Committee. These two individuals set at least portions of their own compensation, as well as the compensation of their colleagues, Friend, Munford, Levinson, Daniels, and Kane.  Their capacity to dole out compensation for themselves and their colleagues makes it impossible for each of them, and any of them, to independently and disinterestedly consider a shareholder demand to investigate or prosecute an action pertaining to the Individual Defendants' illegal conduct.

## XI.    CLAIMS FOR RELIEF

### COUNT I

### Violation of Section 14(a) of the Exchange Act
### (Against the Director Defendants)

136.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein, except as described at ¶ 137, below.

137.    The section 14(a) Exchange Act claims alleged herein are based solely on negligence.  They are not based on any allegation of reckless or knowing conduct by or on behalf of the Director Defendants.  The section 14(a) Exchange Act claims alleged herein do not allege and do not sound in fraud.  Plaintiff specifically disclaims any allegation of, reliance upon any

allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the nonfraud claims.

138.    The Director Defendants negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to shareholders, which were contained in the 2019 Proxy.  In the 2019 Proxy, the Board solicited shareholder votes to reelect defendants Kane, Munford, and Connly to the Board.

139.    The 2019 Proxy incorrectly claimed and led reasonable investors to believe that: (i) the Board was engaged in appropriate and active risk oversight of the Company and its significant financial objectives, plans, and actions; (ii) the Audit Committee appropriately reviewed and approved all press releases containing financial information regarding the Company prior to dissemination, including those made on February 7 and May 2, 2019, and exercised appropriate and active oversight of the Company's accounting and financial reporting process, critical accounting policies and estimates, risk management function, and internal control processes; (iii) the Governance Committee engaged in appropriate and active risk oversight over employees' and directors' compliance with Code of Conduct (including its Disclosure and Insider Trading Policies); and (iv) as a result, defendants Kane, Munford, and Connly, as members of the Board and the Audit or Governance Committees, were well-informed about and exercised appropriate and active oversight over Carbonite's operations, risk management, controls, public disclosures, Code of Conduct, and insider trading.

140.    The Board and its Audit and Governance Committees, which include defendants Kane, Munford, and Connly, did not exercise active and appropriate oversight over the Company's operations, risk management, controls, public disclosures, Code of Conduct, and insider trading.

141.    By reason of the conduct alleged herein, the Director Defendants violated section 14(a) of the Exchange Act.  As a direct and proximate result of these defendants' wrongful conduct, Carbonite misled and/or deceived its shareholders by making misleading statements that were an essential link in shareholders heeding Carbonite's recommendation to reelect certain Board members.

142.    The misleading information contained in the 2019 Proxy was material to Carbonite's shareholders in determining whether to elect these defendants.  This information was also material to the integrity of the directors that were proposed for election to the Board.  The proxy solicitation process in connection with the 2019 Proxy was an essential link in the reelection of nominees to the Board.

143.    Had the 2019 Proxy included appropriate disclosures concerning the Board's oversight failures as described herein, shareholders likely would not have voted to re-elect defendants Kane, Munford, and Connly to Carbonite's Board.  Plaintiff therefore seeks a new 2019 director election on the basis of a special proxy with appropriate corrective disclosures.

144.    The 2019 Proxy further harmed Carbonite in the amount of (i) the costs necessary to issue the appropriate corrective disclosures and to re-run the 2019 director election and (ii) the continued payment of the compensation to Kane, Munford, and Connly (and for which new directors would receive less compensation due to, *inter alia*, the proration of any yearly compensation after appointment).

145.    Plaintiff, on behalf of Carbonite, seeks relief for damages inflicted upon the Company based upon the misleading 2019 Proxy in connection with the improper reelection of the members of the Board.

## COUNT II

### Breach of Fiduciary Duties
### (Against the Individual Defendants)

146.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

147.    The Individual Defendants owed and owe Carbonite fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe Carbonite the highest obligation of good faith, fair dealing, loyalty, and due care.

148.    Each of the Individual Defendants violated their fiduciary duties by consciously causing or consciously failing to prevent the Company from engaging in the improper acts complained of herein.

149.    In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls. Additionally, the Individual Defendants breached their duty of loyalty and good faith by allowing each other to cause, or by themselves causing, the Company to make improper statements in Carbonite's press releases, public filings, and other public statements relating to, *inter alia*, the Company's Server Backup VM Edition and the Company's current operations and future outlook. The Individual Defendants knew or were reckless in not knowing that the Company's Server Backup VM Edition faced many undisclosed material problems that would prevent the Company from closing significant deals, expanding its market, and meeting its publicly-disclosed financial guidance.  These unlawful practices wasted the Company's assets and caused Carbonite to incur substantial damage.

150.    The Securities Class Action Defendants were reckless or grossly negligent in disseminating the improper statements detailed herein.  The Securities Class Action Defendants

intentionally, recklessly, or with gross negligence made improper statements in Carbonite's press releases, public filings, and other public statements relating to the Company's Server Backup VM Edition and the Company's current operations and future outlook. Accordingly, these defendants breached their duty of care and loyalty to the Company. These unlawful practices wasted the Company's assets and caused Carbonite to incur substantial damage.

151.    The Board members also had a duty to comply with and oversee compliance with the Company's Governance Guidelines. The Individual Defendants breached their duty of loyalty and good faith by not complying with the Governance Guidelines by, among other things, failing to adequately oversee management of the Company, failing to establish an environment that promotes timely and effective disclosure, failing to adequately oversee strategic and financial risks and exposures concerning the Company's new product offerings, and failing to evaluate and ensure the integrity of the Company's accounting and financial and reporting systems and internal controls.

152.    The Board members had a duty to properly oversee compliance with Carbonite's Code of Conduct. The Code of Conduct, which applies to all officers, employees, and directors, requires compliance with all applicable laws, rules, and regulations, and specifically bans insider trading. It additionally requires all public communications on behalf of Carbonite be timely, accurate, and complete. As described herein, the Individual Defendants breached their duty of loyalty and good faith by failing to properly oversee compliance with the Code of Conduct by, *inter alia*, making or allowing to be made the improper statements described herein and engaging in or allowing others to engage in violations of law including prohibited insider trading.

153.    The Audit Committee members had a duty to review and approve all press releases containing financial information regarding the Company prior to dissemination, including those

made on February 7 and May 2, 2019.  They also had a duty to properly oversee Carbonite's public disclosure controls and procedures, as well as its risk assessment and management, and internal control functions.  As described herein, the Audit Committee Defendants breached their duty of loyalty and good faith by approving and otherwise allowing the improper statements, and by failing to properly oversee Carbonite's compliance with its public disclosure controls and procedures, risk assessment and management, and internal control functions.  These unlawful practices wasted the Company's assets and caused Carbonite to incur substantial damage.

154.    The Insider Selling Defendants further breached their duty of loyalty by selling Carbonite stock on the basis of material, adverse nonpublic information before that information was revealed to the Company's shareholders.

155.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Carbonite has sustained significant damages.  Accordingly, these defendants are liable to the Company.

156.    Plaintiff, on behalf of Carbonite, has no adequate remedy at law.

## COUNT III

**Breach of Fiduciary Duty for Insider Selling and Misappropriation of Information**
**(Against the Insider Selling Defendants)**

157.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

158.    At the time the Insider Selling Defendants sold their Carbonite stock, they knew the information described herein, including the Undisclosed Facts, and sold such stock on the basis of this information.  The Insider Selling Defendants' improper trades were motivated, in whole or in part, by the substance of this material, adverse nonpublic information.

159.     The information described herein was material, adverse nonpublic information concerning the Company's Server Backup VM Edition product, and its related business metrics, prospects, controls, and governance.  It was an asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold Carbonite stock.

160.     The Insider Selling Defendants' stock sales while in possession and control of this material, adverse nonpublic information was a breach of internal corporate policies and the Insider Selling Defendants' fiduciary duty of loyalty and good faith.

161.     Since the use of the Company's material nonpublic information for their own gain constitutes a breach of fiduciary duty, the Company is entitled to restitution and an order of this Court imposing a constructive trust on the profits and other benefits from the Insider Selling Defendants' improper sales.

162.     By reason of the foregoing, Carbonite was damaged.

163.     Plaintiff, on behalf of Carbonite, has no adequate remedy at law.

## COUNT IV

### Waste of Corporate Assets
### (Against the Individual Defendants)

164.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

165.     As a result of the Individual Defendants' failure to implement adequate controls to ensure that the Company's SEC filings and other public statements were not misleading, Carbonite is subject to the Securities Class Actions.  The Individual Defendants have caused Carbonite to waste its corporate assets by forcing the Company to expend valuable resources in defending itself in the ongoing litigation, in addition to any ensuing costs from a potential settlement or adverse judgment.

166.    As a result of their waste of corporate assets, the Individual Defendants are liable to the Company.

167.    Plaintiff, on behalf of Carbonite, has no adequate remedy at law.

### COUNT V

### Unjust Enrichment
### (Against the Individual Defendants)

168.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

169.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Carbonite.  The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Carbonite.

170.    Plaintiffs, as shareholders and representatives of Carbonite, seek restitution from these defendants, and each of them, and seek an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

171.    Plaintiff, on behalf of Carbonite, has no adequate remedy at law.

## XII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Finding that a shareholder demand on the Carbonite Board would have been a futile and useless act;

B.    Finding that the Individual Defendants have breached their fiduciary duties to the Company, wasted corporate assets, were unjustly enriched, and violated the federal securities laws;

C.      Directing Carbonite to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Carbonite and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's Bylaws or Articles of Incorporation, and taking such other action as may be necessary to place before shareholders for a vote the following corporate governance proposals or policies:

- a proposal to strengthen the Company's disclosure controls to ensure that all material information is adequately and timely disclosed to the SEC and public;

- a proposal to strengthen the Board's supervision of operations, insider trading and compliance with applicable state and federal laws and regulations;

- a proposal to strengthen the Company's internal reporting controls;

- a proposal to declassify the Board;

- a proposal to develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

- a provision to permit the shareholders of Carbonite to nominate three candidates for election to the Board; and

- a provision to appropriately test, and then strengthen, the Company's internal-operational control functions;

D.      Against each of the Individual Defendants in favor of Carbonite for the amount of damages sustained by Carbonite, jointly and severally, in an amount to be determined at trial, together with pre- and post-judgment interest at the maximum legal rate allowable by law;

E.      Requiring the Individual Defendants to return to Carbonite all compensation and remuneration of whatever kind paid to them by Carbonite during the time that they were in breach of the fiduciary duties they owed to Carbonite;

F.      Requiring the Insider Selling Defendants to disgorge all profits realized through their sales of Carbonite stock at artificially inflated prices while in possession of material, adverse

nonpublic information and requiring that such profits be held in constructive trust for the Company's benefit;

G.      Directing the Individual Defendants to establish, maintain, and fully fund effective corporate governance and compliance programs to ensure that Carbonite's directors, officers, and employees do not engage in wrongful or illegal practices;

H.      Requiring a new director election for 2019 on the basis of a special proxy with appropriate corrective disclosures;

I.      Granting additional appropriate equitable and/or injunctive relief to remedy the Individual Defendants' misconduct, as permitted by law;

J.      Awarding to Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees and expenses; and

K.      Granting such other and further relief as this Court deems just and equitable.

## XIII.  DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

Dated: October 14, 2019

**LAW OFFICES OF PETER CHARLES HORSTMANN**

*/s/ Peter Charles Horstmann*

**PETER CHARLES HORSTMANN**
BBO #556377

450 Lexington Street, Suite 101
Newton, MA 02466
Telephone: (617) 723-1980
Facsimile: (617) 663-6339
pete@horstmannlaw.com

*Liaison Counsel for Lead Plaintiff*

**JOHNSON FISTEL, LLP**
MICHAEL I. FISTEL, JR.
40 Powder Springs Street
Marietta, GA 30064
Telephone: (470) 632-6000
Facsimile: (770) 200-3101
MichaelF@johnsonfistel.com

**JOHNSON FISTEL, LLP**
FRANK J. JOHNSON
655 West Broadway, Suite 1400
San Diego, CA 92101
Telephone: (619) 230-0063
Facsimile: (619) 255-1856
FrankJ@johnsonfistel.com

*Attorneys for Plaintiff*